IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:15-cv-00449-DDD-TPO

SCHMETTER & ASSOCIATES, LLC,

    Plaintiff and Counter Defendant,

v.

BERNZOTT CAPITAL ADVISORS, INC.,
KEVIN BERNZOTT,

     Defendants and Counter Claimants.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

The parties to this dispute once had a mutually beneficial contractual relationship whereby Plaintiff helped to market Defendants' goods and services. After a number of years, however, the benefits of that relationship waned, the relationship grew acrimonious, and eventually the parties terminated their contract. Believing it was not paid a commission it was owed on one account, Plaintiff demanded payment of somewhat over $33,000. Ex. 117 at 3. When it wasn't paid, Plaintiff sued. Since the suit was filed in 2015, Plaintiff's theory of what it is owed has expanded to include approximately $10,000,000 in claimed damages. While that new theory fits within the broad language of the parties' agreements, it is, with a few exceptions, contrary to the way the parties actually conducted themselves, the way Plaintiff and its principals expressed and understood their contractual rights during the relationship, and the preponderance of the evidence at the bench trial held in November of this year. Therefore, other than a few items, including the claim that started this all, I conclude that Plaintiff is not entitled to the millions it now seeks.

## FINDINGS OF FACT[1]

### A. The Parties

1. Plaintiff Schmetter & Associates, LLC, is a third-party marketing firm, founded in 1990, which provides sales and marketing services to investment advisory firms. Dkt. 367 at 3.

2. Schmetter is comprised primarily of if its two members and principals, Randon "Randy" Schmetter and Gretchen Schmetter.[2] Trial Tr. 11/6/2024 (testimony of Randy Schmetter).[3]

3. Schmetter is a limited liability company organized and in good standing in the state of Colorado, whose members are all citizens of Colorado, and doing business in Morrison, Colorado. Dkt. 367 at 1.

4. Defendant Bernzott Capital Advisors, Inc. is a Texas corporation formerly incorporated in California as Bernzott Capital Advisors Corporation. Dkt. 367 at 1–3.

---

[1]   Plaintiff objected both in writing and orally during trial to the admission of certain evidence it viewed as inadmissible under the parol evidence rule, which bars extrinsic evidence that contradicts or varies a written contract. *See, e.g.*, Trial Tr. 11/7/2024. To the extent that any such evidence presented at trial may have been used to interpret unambiguous terms in the parties' contracts, I have not considered it for that improper purpose. I may have, however, considered evidence to which Plaintiff objected for the purpose of determining whether or not the parties modified their agreements through their course of performance. *See* Dkt. 398 at 3 ("The court therefore will accept admissible extrinsic evidence at the bench trial to prove Defendants' waiver and modification defenses.").

[2]   In this Order, "Plaintiff" or "Schmetter" is meant to refer to the entity Schmetter & Associates while the individual Schmetters are referred to by their names. Likewise, "Bernzott" will refer to the Bernzott corporate entity while Kevin Bernzott will be referred to by name or as Mr. Bernzott.

[3] Citations to trial transcripts herein are to rough transcripts as official transcripts were not available at the time this order was drafted.

5. Bernzott is an investment advisory firm that provides a range of services to both high-net-worth individuals and institutional clients. Dkt. 367 at 3. Bernzott began providing investment advisory services in 1995. *Id.*

6. Defendant Kevin Bernzott is the chairman and founder of Bernzott Capital Advisors and is a citizen of Texas residing in Lakeway, Texas. Dkt. 367 at 2.

## B. The Contracts

1. Schmetter and Bernzott entered into the first of three contracts on October 1, 2003. Ex. 1.

2. Under the terms this Client Relations Agreement, Schmetter agreed to provide marketing services for Bernzott in exchange for a yearly $80,000 retainer fee and "25% of the fees earned by [Bernzott]" on "each new advisory and management account obtained by [Bernzott] during the life of this agreement." Ex. 1 at 4.

3. Schmetter and Bernzott agreed that Schmetter was not entitled to a commission on any accounts open at Bernzott prior to their first Client Relations Agreement. Ex. 1 at 4.

4. Schmetter and Bernzott entered into their second Client Relations Agreement on October 1, 2011. Ex. 2.

5. This agreement changed the parties' compensation arrangement such that Schmetter would only be entitled to 20% of Bernzott's fees on newly opened, qualifying accounts, to be paid for the first five years of the account's life. Ex. 2 at 4. Schmetter would thereafter be entitled to 10% of Bernzott's fees on these accounts, but only if Schmetter continued to provide customized reporting to the client. *Id.*

6. The second Client Relations Agreement stated that the "parties acknowledge that [Schmetter's] duties and [Bernzott's] duties and compensation due to [Schmetter] shall remain in effect regarding clients

- 3 -

obtained prior to October 1, 2011 pursuant to the Client Relations Agreement of October 1, 2003." Ex. 2 at 1.

7. On March 31, 2013, Schmetter and Bernzott entered into a Modification Agreement. This agreement reduced Schmetter's services for Bernzott and portended the end of their relationship, but stated that "[Bernzott] shall continue to pay [Schmetter] the compensation set forth in the Client Relations Agreement dated October 1, 2011, and the predecessor Client Relations Agreement dated October 1, 2003." Ex. 3 at 2.

8. Both the first and second Client Relations Agreements contained provisions stating that within thirty days after the termination of the agreements, Schmetter was to "deliver to [Bernzott] a written list of prospects and consultants whom [Schmetter] has contacted during the life of this agreement; and [Bernzott] agrees that if, within twelve (12) months after the termination of this agreement, any of said prospects becomes a client of [Bernzott], or if anyone referred to [Bernzott] by any of said consultants becomes a client of [Bernzott], then all fees earned by [Bernzott] from such later-acquired clients of [Bernzott] named in said list (or referred to [Bernzott] by any consultant so named), on whatsoever account such fees may be earned, shall be included in the calculations of commissions payable to [Schmetter] with the same effect as though this contract had been in effect when such clients were acquired by [Bernzott]." Ex. 1 at 4; Ex. 2 at 4.

9. On April 30, 2013, Schmetter provided Bernzott with a list of prospects and consultants pursuant to the terms of the second Client Relations Agreement. Ex. 16. This list contained numerous prospects and consultants which subsequently opened accounts with Bernzott. *E.g.*, Ex. 107. Kevin Bernzott testified that he refused to honor this list, however, because he was looking for a list of active prospects that Schmetter had engaged with somewhere in the sales cycle from initial contact to final

- 4 -

presentation, not a list of every consultant in the world. Trial Tr. 11/7/2024 (testimony of Kevin Bernzott).

**C. Schmetter's Claims**

1. In the operative complaint, Schmetter brings claims for breach of contract, false representation, negligent misrepresentation, quantum meruit, and unjust enrichment. Dkt. 367 at 24–32.

2. The parties' cross-claims for declaratory judgment were dismissed prior to trial. Trial Tr. 11/4/2024.

3. The substance of Schmetter's breach-of-contract allegations is that Bernzott violated their contracts by concealing new accounts and by failing to pay commissions pursuant to the terms of the 2003, 2011, and 2013 agreements. Dkt. 367 at 24–27.

4. While this lawsuit originated in 2015 based on allegations that Bernzott had failed to pay commissions on a single account—the Missouri Department of Transportation account—Schmetter now claims that it learned through the discovery process of approximately 9,400 instances in which Bernzott failed to pay Schmetter on commissionable accounts. Dkt. 1 at 10–12; Ex. 4 at 2.

5. Schmetter also alleges that it was fraudulently or negligently induced to enter into the 2011 and 2013 agreements by Bernzott Capital Advisors and by Kevin Bernzott in his individual capacity. Dkt. 367 at 27–31. As a remedy, Schmetter seeks to rescind these agreements and have its damages calculated based on the higher commission rate outlined in the 2003 agreement. Dkt. 428 at 11 n.1.

**D. The Parties' Course of Performance**

1. During the course of the 2003 and 2011 agreements, Schmetter showed a pattern of accepting commissions only on accounts in the institutional sector and on accounts that Schmetter had introduced to Bernzott. Ex. 551; 552 at 1 ("FYI, this is institutional—you get paid, de Martino doesn't."); 553; 567; 582.

2. During the course of the parties' relationship, Schmetter repeatedly stated in marketing materials sent to the public and in disclosure statements sent to prospective customers that it was only entitled to commissions on assets placed under management at Bernzott by the clients that it actually introduced to the investment firm. Ex. 130 at 2; 500 at 48, 49; 560 at 20, 21; 583 at 20, 22.

3. During the process of negotiating the 2011 agreement, Gretchen Schmetter told Kevin Bernzott that "We don't want to get paid on anything we haven't participated in." Ex. 539 at 2.

4. During the course of the 2003 and 2011 agreements, Schmetter focused its marketing efforts on new customers in the institutional sector, which were defined in the 2011 agreement to include "investment consultants, endowments, foundations, taxable corporates, pension plans, public plans, Taft Hartley/Unions, manager of manager programs, emerging manager programs and non-California based wealth management offices/intermediaries." Ex. 2 at 1; 615; 618; 619; 621.

5. During the course of the 2003 and 2011 agreements, Schmetter knew that marketing to high-net-worth individuals was primarily undertaken by in-house employees at Bernzott. Ex. 615; 618; 619; 621.

6. Schmetter never stated to Bernzott or to third parties that it was entitled to commissions on all new business obtained by Bernzott regardless of whether Schmetter had a hand in helping acquire that business.

7. Schmetter had access to and was aware of information about all new accounts being opened by Bernzott during the life of the 2003 and 2011 agreements and was aware that it was not being compensated on all of those accounts. Ex. 511; 512; 518; 526; 530; 533; 535; Trial Tr. 11/6/2024 (testimony of Randy Schmetter).

8. Randy and Gretchen Schmetter testified that they had no way of knowing whether accounts on which they were not receiving a commission predated the 2003 agreement and were thus not commissionable. Trial Tr. 11/4/2024 (testimony of Gretchen Schmetter); Trial Tr. 11/6/2024 (testimony of Randy Schmetter). Given the depth of access that Schmetter had to Bernzott's internal accounting systems, however, I do not find this testimony to be credible. Schmetter was aware that it was not being compensated on nearly half of the funds under management at Bernzott, and to the extent the Schmetters were unsure whether those accounts were not commissionable as "legacy" accounts, they had an obligation to at least ask Bernzott whether that was the case. They therefore either knew or should have known that there were a number of non-"legacy" accounts on which they were not receiving a commission. Ex. 512 at 1 ("When I look at the growth in AUM being driven by you and Gretchen, $746 million this morning by the way, I'm thrilled out of mind to have you working with us. We are now compensating you on 162 accounts aggregating $430 million."); Ex. 539 at 2 ("We don't want to get paid on anything we haven't participated in.").

### E. Advent v. Invoices

1. To the extent that there are inconsistencies between the data in Bernzott's internal Advent accounting system and the Summary of Management Fee invoices provided to Plaintiff in discovery, I find the Advent data to be more reliable. While the invoices are sometimes corroborated by rates in the contracts between Bernzott and its clients, many do not

contain the addresses of their purported recipients or state that they are for "informational purposes only" and not to be paid. Trial Tr. 11/6/24 (testimony of Priscilla Simon); Matthew Lausten Tr. at 221:22–226:17.[4] Priscilla Simon, a director of operations at Bernzott, also testified at trial that some invoices were inaccurate, inconsistent with contractually defined fee schedules (such as those related to Absolute Advisors), or automatically generated using incorrect rates. Trial Tr. 11/6/24 (testimony of Priscilla Simon). Additionally, the contractual rates themselves may be unreliable to the extent they were renegotiated over the course of a relationship between Bernzott and a particular client.

**F. Expert Reports on Damages**

1. Having reviewed the expert reports in this case and over nine hours of expert witness testimony taken on August 26 and 27, 2024, I find that Plaintiff's expert Mathew Lausten's damages methodology is reliable. Given my finding that the Advent data was the most reliable data source provided to Plaintiff, I also find that Mr. Lausten's reliance on Advent as opposed to the Summary of Management Fee invoices was reasonable.

**G. Bernzott Small Cap Value Mutual Fund ("BSCVX")**

1. Bernzott started the BSCVX mutual fund in 2012. Ex. 547.

2. Randy Schmetter testified that the Schmetters personally invested in BSCVX. Trial Tr. 11/6/2024 (testimony of Randy Schmetter).

3. Schmetter did not receive commissions on funds placed under management in the BSCVX mutual fund. Ex. 674 at 328:1–329:5.

---

[4] Expert witness testimony was recorded by video in advance of the bench trial.

### H. Missouri Department of Transportation Account ("MoDOT")

1. The MoDOT account was opened with Bernzott on July 18, 2013. Ex. 107; 113; 610; 673 at 172:20–23.

2. MoDOT had an agreement with New England Pension Consultants ("NEPC") pursuant to which NEPC was to provide MoDOT with consulting services. Ex. 66.

3. Bernzott typically compensated Schmetter on accounts that used NEPC as a consulting service. Ex. 9 at 195, 772.

4. Bernzott did not compensate Schmetter on the MoDOT account. Ex. 113; 120.

### I. Elks Foundation Account

1. The Elks Foundation became a client of Bernzott on August 12, 2005. Ex. 124; 625. Bernzott initially paid Schmetter on this account pursuant to the terms of the 2003 agreement. Ex. 9 at 259–60.

2. During the pendency of this case, Schmetter learned that Bernzott had opened a second Elks Foundation account on which it was not being compensated. Ex. 126; 671 at 144:21–145:11; Trial Tr. 11/6/2024 (testimony of Randy Schmetter).

3. After a hearing before Judge Kane in which he suggested that Bernzott should compensate Schmetter on the second Elks account, Bernzott sent Schmetter an e-mail and a check, advising that "we've decided to pay you for the 2nd Elks Account." Ex. 126.

4. The commission that Schmetter received, however, was not calculated correctly, and the check was returned to Bernzott. Ex. 126.

### J. Community Hospital of San Buenaventura

1. The Community Hospital of San Buenaventura became a client of Bernzott on December 13, 2004, during the term of the first Client Relations Agreement. Ex. 41.

2. When Bernzott switched the funds that were in this account into a Merril Lynch unified managed account ("UMA"), it told Schmetter that the San Buenaventura account had "terminated" and that "you will get paid based off the management fees we get from that." Ex. 150; 671 at 360:21–361:19; Trial Tr. 11/4/2024 (testimony of Gretchen Schmetter).

### K. Capital Prospects

1. Capital Prospects is a manager of other money managers and was introduced to Bernzott by Schmetter in 2004. Ex. 202 at 41:7–18.

2. Capital Prospects first engaged Bernzott as a portfolio manager on June 21, 2006, when it placed funds with Bernzott on behalf of the San Joaquin County Employees Retirement Association. Ex. 44.

3. Bernzott compensated Schmetter on five Capital Prospects relationships between 2005 and 2016. Ex. 135; 202 at 47:3–21.

4. During discovery, Schmetter learned it was not being compensated on a relationship between Capital Prospects and Bernzott related to the funds for the City of Memphis Retirement System. Ex. 133; 202 at 80:5–21.

### L. Absolute Advisors

1. Absolute Advisors entered into an investment subadvisory agreement with Bernzott for a mutual fund on May 5, 2005. Ex. 149.

2. Absolute Advisors learned of Bernzott through a database populated by Schmetter. Ex. 552; 622.

3. The evidence presented at trial demonstrated that Bernzott paid commissions to Schmetter on this account. Ex. 9 at 295. While Schmetter insists that it was underpaid on this account, and that the rates defined in the contract between Bernzott and Absolute show that Schmetter should have received higher commissions than it actually did, Schmetter's own expert determined (using data from Advent) that Schmetter was actually *overpaid* by about $5,000 on that account. Ex. 10 at 225:17037–17057; Dkt. 530 at 11.

**M. UMA Program**

1. Starting around 2014, Bernzott began to provide a service in which it offered access to model investment portfolios in exchange for a fee. Ex. 157. This is referred to as the UMA program.

2. The data relating to the UMA program was not contained in Bernzott's Advent system, and despite Schmetter's general awareness that it was not being compensated on new accounts being opened at Bernzott, it did not have access to data relating to the UMA program. Trial Tr. 11/6/2024 (Testimony of Priscilla Simon).

**N. Motion for Sanctions**

1. Plaintiff's latest motion for sanctions, Dkt. 411, is the fourth such motion it has filed in this case. Dkt. 243 at 1–2 (discussing Dkt. 34, 78, 157). All three prior motions were denied by the judges previously presiding over this case. *Id*. at 1–2; 15.

2. The present motion for sanctions was filed after a discovery dispute regarding to Defendants' purported failure to properly respond to an interrogatory requesting identification of the "fees collected" from "each and every advisory account." Dkt. 411 at 5. After a hearing on the dispute, Magistrate Judge James P. O'Hara ordered Defendants to

"provid[e] a complete response to the subject interrogatory, as written."
Dkt. 407.

3. Defendants state that they complied with Judge O'Hara's order by producing records from their QuickBooks accounting system related to fees received from the BSCVX mutual fund and their UMA program. Dkt. 442 at 5; Ex. 157. Plaintiff, however, maintains that these productions were incomplete, evasive, and nonresponsive to the interrogatory at issue. Dkt. 466 at 6–14.

## CONCLUSIONS OF LAW

### A. Modification and Waiver

1. As stated in the Order on the Parties' Pre-Trial Briefs, "Section 4(A) in both the First and Second Contracts expressly provides that Plaintiff was owed commissions for 'each' and 'all' 'advisory and management accounts' obtained during the life of the agreements and for twelve months following termination of the agreements, regardless of whether such accounts were 'institutional' or 'institutional-related.'" Dkt. 388 at 16. This language, standing on its own, would have entitled Schmetter to commissions on accounts of every type opened with Bernzott during the life of these agreements.

2. The parties, however, modified this express language through their conduct and course of performance. *See Cordillera Corp. v. Heard*, 592 P.2d 12, 14 (Colo. App. 1978), *aff'd*, 612 P.2d 92 (Colo. 1980) ("[A] provision requiring that all modifications of a contract be in writing, may itself be waived orally or by conduct of the parties."); *Westinghouse Credit Corp. v. Shelton*, 645 F.2d 869, 873–74 (10th Cir. 1981) ("[T]he weight of

authority, and the view we think Oklahoma[5] state courts would follow, is that an 'anti-waiver' clause, like any other term in the contract, is itself subject to waiver or modification by course of performance and that whether such waiver or modification has occurred is a question for the factfinder."). The modified Client Relations Agreements only entitled Schmetter to commissions on institutional accounts or on accounts that they helped acquire.

3. Even if the parties' conduct were insufficient to modify the express language of the Client Relations Agreements, Schmetter waived commissions on non-institutional accounts and on accounts it did not introduce to Bernzott by learning that such accounts had been opened at Bernzott and failing to request any commissions on them.[6] *James H. Moore & Assocs. Realty Inc. v Arrowhead at Vail*, 892 P.2d 367, 372 (Colo. App. 1994) ("[A]n express provision may be waived, either expressly or by implication. Such a waiver may be implied if a party engages in conduct which manifests an intent to relinquish the right or privilege or acts inconsistently with its assertion." (citation omitted)).

4. The conclusions that the parties modified or Schmetter waived the express language of the Client Relations Agreements are supported by at least the following facts:

a. The parties, including the Schmetters, never acted consistently with the broad language of the first and second contracts they now wish

---

[5]  Though *Westinghouse* addresses Oklahoma law, it collected relevant cases from numerous jurisdictions, and given *Cordillera*, I see no reason the result would be any different under Colorado law.

[6]  The fact that Schmetter knew about new accounts and failed to request commissions on them also raises statute-of-limitations problems, at least for any accounts opened before March 2012. *See* Colo. Rev. Stat. § 13-80-101(1)(a) (statute of limitations for contract actions is three years).

to enforce. Their conduct and representations to one another and to third parties in fact demonstrated that they understood Schmetter to only be entitled to commissions either on institutional clients or on clients they actually secured for Bernzott. Ex. 130 at 2; 500 at 48, 49; 560 at 20, 21; 583 at 20, 22.

b. The parties also took pains to honor their understanding that Schmetter would be responsible for securing new institutional business while in-house employees of Bernzott would be responsible for securing new retail and high-net-worth business. Ex. 615; 618; 619; 621. They viewed this division of labor as important at least in part because they were operating on the understanding that Schmetter would be compensated on institutional business but not retail or high-net-worth business that it was not responsible for acquiring. Ex. 552 at 1 ("FYI, this is institutional—you get paid, de Martino doesn't.").

c. Schmetter had access to Bernzott's files and data and was able to run reports that included every account under management at Bernzott. Ex. 532; 533.

d. Schmetter knew which accounts it was being compensated on and worked with employees at Bernzott to reconcile accounts and to ensure that Schmetter was being compensated on every account on which it was entitled to a commission. Ex. 518; 526; 530; 533; 535; 567; 591.

e. Schmetter was meticulous about making sure it was being compensated correctly on commissionable accounts and was or should have been aware that it was not being compensated on many of the new accounts that were opened with Bernzott during the life of their contractual agreements. Ex. 581; 582; 590; 591; 594; 596.

f.  Schmetter never demanded payment on all new accounts regardless
of whether it secured the account or whether it was institutional
prior to this lawsuit.

g.  In disclosures sent to prospective clients, Schmetter represented that
it collected "investment management fees on assets placed under
management at Bernzott *by each client brought to Bernzott by S&A*."
Ex. 500 at 48 (emphasis added). These disclosures were made repeat-
edly throughout the life of the first contract between the parties. *See,
e.g.*, Ex. 560 at 20; 583 at 20; 599 at 30. They were also made during
the life of the second contract. Ex. 601 at 20.

h.  Schmetter made other representations indicating that it understood
the contracts to only entitle it to commissions on "collected revenue
from specified institutional clients." Ex. 78 at 21.

5.  In addition, Schmetter specifically waived any right to commissions on
funds placed with BSCVX because Randy and Gretchen Schmetter knew
about the fund (and even invested in it) and never requested a commis-
sion on money placed in it until this litigation. *See James H. Moore*, 892
P.2d at 372; Trial Tr. 11/6/2024 (testimony of Randy Schmetter).

## B. Breach of Contract

1.  Even under the narrower contract interpretation that controls after ac-
counting for modification and waiver, Schmetter is still entitled to pay-
ment on certain accounts for which it never received a commission, as
set forth below. Bernzott's failure to pay Schmetter these owed commis-
sions is a breach of the contracts at issue. *W. Distrib. Co. v. Diodosio*,
841 P.2d 1053, 1058 (Colo. 1992) (stating elements of breach of contract
claim).

2.  The evidence at trial established that Schmetter should have been com-
pensated on the MoDOT account. MoDOT had an agreement with NEPC

whereby the latter would provide MoDOT with consulting services, and Bernzott had previously compensated Schmetter on accounts that were connected with NEPC. Ex. 9 at 195, 772. Because NEPC was on the list of prospects and consultants[7] that Schmetter gave to Bernzott in 2013 and the MoDOT account was opened less than a year later, Schmetter should be compensated at 20% on any funds placed in that account for the five years following its opening. Ex. 113.

3. Schmetter should have been compensated on the second Elks Foundation account. Because money was placed in this account pursuant to an addendum to the initial contractual agreement between Bernzott and Elks, it constituted additional funds placed under management of an account commissionable under the first Client Relations Agreement, and Bernzott should have compensated Schmetter on money placed in this account at the 25% evergreen rate. Ex. 124; 125.

4. Bernzott should have continued to compensate Schmetter on the funds in the Community Hospital of San Buenaventura account after these funds were moved to a UMA.[8] To the extent Bernzott has not paid commissions on fees collected from these funds after 2016, it must continue

---

[7]    Kevin Bernzott testified at trial that he refused to honor Schmetter's list of prospects and consultants because he was looking for a list of active prospects that Schmetter had engaged with somewhere in the sales cycle from initial contact to final presentation, not a list of every consultant in the world. Trial Tr. 11/7/2024 (testimony of Kevin Bernzott). While I understand Mr. Bernzott's point, the relevant contract language is clear that Schmetter was entitled to provide, and Bernzott was obligated to honor, a "list of prospects *and* consultants whom [Schmetter] has contacted during the life of this agreement." Ex. 2 at 4 (emphasis added).

[8]    Bernzott appears to have acknowledged this in an email from 2016, but the record is not clear whether Schmetter ever actually received a commission after the funds were moved to a UMA.

to do so under the first Client Relations Agreement at the 25% evergreen rate. Ex. 41.

5. Bernzott should have compensated Schmetter on funds placed under management by Capital Prospects on behalf of the City of Memphis Retirement System. Because these funds were placed with Bernzott pursuant to a new contract, they constituted a new account opened by an existing client introduced to Bernzott by Schmetter, and Bernzott should have compensated Schmetter on money placed on behalf of the City of Memphis at the 20% rate outlined in the second Client Relations Agreement for the first five years of the life of the account. Ex. 605 (Randy Schmetter email indicating that Capital Prospects accounts opened after 2012 should be compensated at 20%).

6. Bernzott should have compensated Schmetter on fees it received related to its UMA program. Bernzott's primary argument that it does not owe Schmetter commissions on these fees is that UMAs are not "accounts" because Bernzott has no discretionary control over the funds for which a model portfolio is provided. This position, however, would collapse the distinction between "management" and "advisory" accounts that the parties clearly made in their agreements.[9] If it were true that Bernzott needed to have discretionary authority over funds in order for those funds to be considered "accounts," then it seems there would be no such thing as an "advisory" account—by definition an account where Bernzott does not have the authority to make investments but on which it only gives advice. Bernzott's position cannot be right, as it would render the inclusion of such accounts in the contracts entirely meaningless. *See, e.g.*, *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1283 n.15 (10th Cir. 2017) ("The canon against surplusage indicates that we

---

[9] It also overlooks the obvious fact that the term "unified managed account" itself contains the term "account."

generally must give effect to all [contractual] provisions, so that no part will be inoperative or superfluous—each phrase must have distinct meaning."); *accord Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 700 (Colo. 2009) ("We choose a construction of the contract that harmonizes provisions instead of rendering them superfluous."); *U.S. Fidelity & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992) ("Each *word* in an instrument is to be given meaning if at all possible."). Furthermore, given the breadth of the contract language in the first and second Client Relations Agreements as well as the lengthy prospects and consultants list that was provided to Bernzott, the fees collected from the UMA program were presumptively commissionable to Schmetter under their second agreement under the language of the contracts. Ex. 87; 150; 152. Bernzott has not carried its burden to show that its affirmative defenses of waiver or modification applied to these accounts, and Schmetter is therefore entitled to a 20% commission on the entirety of the fees collected for the first five years of the UMA program.

7. Bernzott does not owe Schmetter any additional fees related to the Absolute Advisors account. *Compare* Ex. 9 at 295, *with* Dkt. 530 at 11.

8. Bernzott must pay Schmetter statutory prejudgment interest at the rate of 8% per year, compounded annually, on all damages ordered herein. Colo. Rev. Stat. § 5-12-102 (2023).

## C. Findings of Fact Regarding Damages for Breach of Contract

1. Bernzott must pay Schmetter $117,000.68 on the MoDOT account. Though Schmetter would presumptively be entitled to five years of commissions on this account which opened in 2013, it appears from Mr. Lausten's calculations that the MoDOT account closed after the first quarter of 2016. Ex. 9 at 509:33335–44.

2. Bernzott must pay Schmetter $41,015.81 on the second Elks account. Mr. Lausten only had access to Advent data through December 31, 2019, so I have made the reasonable inference based on the evidence available to me that quarterly commissions from the first quarter of 2020 through the last quarter of 2024 were equal to the last commission owed in 2019 ($1,337.50). Ex. 10 at 192:14395–193:14435.

3. Bernzott must pay Schmetter $58,917.68 on the City of Memphis Retirement System account. Since this account is compensable under the second contract, Bernzott owed Schmetter 20% of its fees for five years, through the last quarter of 2020. I have made the reasonable inference from the evidence available to me that the commissions owed in 2020 were equal to the last commission owed in 2019 ($3,928.66). Additionally, since Mr. Lausten assumed this account was compensable at a 25% rate instead of a 20% rate, I applied a 20% discount to the sum total of commissions owed to Schmetter under his analysis and my inference. Ex. 9 at 175:7940–176:8007.

4. Bernzott must pay Schmetter $95,130.73 of the fees collected from its UMA program. Because Bernzott owed Schmetter UMA fees under the momentum clause of the modification agreement and the compensation provisions of the second contract, I calculated Schmetter's fees on this account by taking 20% of the fees paid to Bernzott from the UMA program through March 28, 2019, roughly five years after the end of the momentum period that began on March 31, 2013. Ex. 157 at 2–4.

5. Bernzott must pay Schmetter $19,755.01 on the Community Hospital of San Buenaventura account. The last quarterly commission due to Schmetter on this account was $881.92 on December 31, 2015, before the funds were moved to a UMA. Ex. 9 at 627:42271. I have made the reasonable inference that this same amount was due to Schmetter for each subsequent quarter through the last quarter of 2024. However,

since I have already ordered Bernzott to pay 20% of all UMA fees through the second quarter of 2019, Bernzott only owes Schmetter the 5% difference on this account ($176.38) between the first quarter of 2016 and the second quarter of 2019.

**D. Tort Claims and Equitable Remedies**

1. Schmetter did not present any evidence that Bernzott Capital Advisors or Kevin Bernzott made any kind of misrepresentation to Schmetter during the negotiation of their contractual arrangements, let alone an intentional or fraudulent misrepresentation. To the extent Mr. Bernzott indicated that he intended to fulfill his obligations under the Client Relations Agreements and subsequently did not, this simply reflects a dispute about the meaning of the contracts at issue, not a malicious or even negligent attempt to induce Schmetter to agree to terms which he had no intention of honoring. Schmetter's claims for negligent and fraudulent misrepresentation are therefore dismissed.[10] *See, e.g., Kopeikin v. Merchs. Mortg. & Trust Corp.*, 679 P.2d 599, 601 (Colo. 1984) ("In general, a party asserting a claim in tort has the burden of proving that claim by a preponderance of the evidence.").

2. Schmetter has also failed to prove its claims for quantum meruit or unjust enrichment. If Bernzott retained a benefit that rightfully belonged to Schmetter pursuant to the terms of their express agreements, then the proper remedy is a breach-of-contract claim, not a claim sounding in

---

[10]  I am also skeptical that Schmetter may, as a matter of law, ask for the 2013 and 2011 agreements to be rescinded on the basis of fraudulent or negligent misrepresentation, only to fall back on the earlier, terminated, 2003 agreement. During closing argument, Schmetter conceded that it was not aware of any cases in which any court had granted such relief. Trial Tr. 11/7/24. To the extent more typical equitable relief was appropriate (e.g., quantum meruit), it would be virtually identical to the amounts I find are due to Schmetter under the contracts as described above, *see* D.2., below. So these claims are redundant as well.

quasi-contract. *See Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 444 (Colo. 2000) ("Quantum meruit," which is "also termed quasi-contract or unjust enrichment," "is a theory of contract recovery that invokes an implied contract when the parties either have no express contract or have abrogated it."). If Bernzott retained a benefit that was not owed to Schmetter pursuant to the language of their arrangements, that is also a matter of express contractual obligation (or the lack thereof), and not quasi-contract. Plaintiff's equitable claims are therefore dismissed.

### E. Schmetter's Motion for Sanctions

1. The Court may order various sanctions if a party "fails to obey an order to provide . . . discovery." Fed. R. Civ. P. 37(b)(2)(A), (C). Schmetter has failed to demonstrate that Defendants' interrogatory response was non-compliant with Judge O'Hara's order after the April 2024 hearing on the parties' discovery dispute. Dkt. 407.

2. To the extent that Schmetter argues that Defendants should have produced QuickBooks accounting data for all accounts on which it received a fee, not just the BSCVX mutual fund and the UMA program, that argument has been repeatedly raised and rejected over the many years that this case has been in litigation. *See* Dkt. 243 at 3, 12 ("[T]he history of the discovery disputes in this case is significant. Judge Matsch denied Plaintiff's First and Renewed Motions [for sanctions] because he considered Plaintiff's document requests and computer search protocols to be too broad, a problem he repeatedly (and unsuccessfully) attempted to remedy by directing counsel to confer to narrow the requests and protocols."). I see no reason to reconsider those prior rulings now, and accordingly hold that any request for QuickBooks data beyond what was produced by Defendants is outside the scope of discovery as defined by Federal Rule of Civil Procedure 26(b)(1) because "Plaintiff has not shown

pg 22 of 23

that the important considerations of proportionality and relative burden and expense weigh in its favor." *Id* at 12, 13 ("Plaintiff does nothing to remedy [the] problem [of overbreadth] by simply reasserting the same previously rejected arguments based on the same overbroad discovery requests.").[11]

3. Schmetter has also failed to show that Defendants' interrogatory responses, in the form of various document productions, were made in bad faith. Though Schmetter repeatedly asserts that they were, it has offered no evidence of bad faith beyond its argument that the interrogatory at issue sought information related to fees collected from all accounts subject to an "advisory" or "subadvisory" agreement, not just fees collected from the BSCVX fund or the UMA program. Dkt. 466 at 7–8. Given the history of discovery disputes in this case, however, I find Defendants' understanding of "advisory" to be a reasonable interpretation of the language in Schmetter's interrogatory. Dkt. 442 at 3. That is especially so in light of the fact that Plaintiff has failed to explain why its contrary interpretation of that term would have required Defendants to produce anything different from what they have already given to Schmetter or from what Schmetter already has. I therefore hold that Bernzott has sufficiently responded to Schmetter's interrogatory and identified the "fees collected" by Bernzott for "each and every advisory account." *See* Dkt. 442 at 4.

4. Schmetter does have a point that the discrepancies in Bernzott's productions make it impossible to calculate damages in this case with absolute certainty. As the finder of fact, however, I am permitted to make reasonable inferences and approximations given the evidence presented to me.

---

[11]   Given my finding that the Advent data is reliable, Schmetter has also failed to show that additional information beyond what Defendants have already produced in this case is necessary.

*W. Conf. Resorts, Inc. v. Pease*, 668 P.2d 973, 977 (Colo. App. 1983) ("The law permits approximation of the amount of damages provided the fact of damages is certain."); *Eccher v. Small Bus. Admin.*, 643 F.2d 1388 (10th Cir. 1981) ("It is sufficient if the evidence show[s] the extent of damages as a matter of just and reasonable inference, although the result be approximate.").

## CONCLUSION

It is **ORDERED** that:

Final judgment will enter in favor of Schmetter and against Bernzott on Schmetter's claim for breach of contract in the amount of $331,819.91 plus statutory prejudgment interest;

Bernzott must pay Schmetter costs pursuant to Fed. R. Civ. P. 54(d), but given the mixed result here, Plaintiff's litigation conduct (*see, e.g.*, Dkt. 490), and that Schmetter's pursuit of a theory of the case inconsistent with how it behaved during the parties' relationship was largely responsible for any costs it may have incurred, Bernzott must only pay Schmetter 30% of the costs that would otherwise be awardable;

Schmetter's claims for fraudulent misrepresentation, negligent misrepresentation, unjust enrichment, and quantum meruit are **DISMISSED**; and

Schmetter's Motion for Sanctions, **Dkt. 411**, is **DENIED**.

DATED: December 17, 2024        BY THE COURT:

Daniel D. Domenico
United States District Judge

- 23 -